**AXIS, S.p.A., Plaintiff,**

v.

**MICAFIL, INC., Defendant.**

**No. C87–1956.**

United States District Court,
N.D. Ohio, E.D.

Dec. 31, 1987.

Stanley M. Fisher, Walter Bates, Arter & Hadden, Cleveland, Ohio, William Rand and Robert E. Williams, David H. Marks, Coudert Bros., New York City, for plaintiff.

Richard E. Guster, Roetzel & Andress, Akron, Ohio, Michael J. Levin, Roger Boyle, Boyle, Vogeler & Haimes, New York City, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION.

This is an antitrust action filed by the plaintiff against the defendant for alleged violations under § 1 of the Sherman Act and § 7 of the Clayton Act seeking damages and equitable relief under §§ 4 and 16 of the Clayton Act. The plaintiff claims that it has suffered antitrust injuries as a result of the defendant's acquisition of two out of four U.S. armature manufacturing companies thus limiting the ability of the plaintiff to enter the U.S. market.

The defendant has moved the Court for a motion to dismiss asserting that the plaintiff has failed to allege the necessary element of an antitrust action that being an antitrust injury. The plaintiff has replied to the motion, and for the reasons that appear below, the motion is granted.

### II. BACKGROUND.

Axis, S.p.A. ("Axis") is an Italian corporation organized under the laws of Italy with its principal place of business in Florence, Italy. The defendant Micafil, Inc. ("Micafil") is a corporation organized under the laws of the State of Delaware and is a wholly-owned subsidiary of Micafil A.G. ("Micafil A.G."), a corporation organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Both companies are engaged in the manufacturing of electrical equipment, and specifically the manufacturing of armature winding machines.

Both the plaintiff and the defendant manufacture machines that are used in the manufacture of fractional power commutator motors. Household appliances such as vacuum cleaners, food processors, and electrical drills all include a fractional power commutator motor as its source of power. A necessary component of a fractional power commutator motor is an armature.

An armature winding machine operates by spinning wires around a core, attaching them to a commutator tang and then cutting the wire to permit removal from the machine. Purchasors of such machines require that they incorporate a device to grip the wire and either break it or cut it, depending on the thickness of the wire and the ability of the breaking or cutting device to operate on it with precision. For many uses, a wire cutting device must be employed and no economically practical alternatives are available. Complaint, ¶ 7.

The ability to manufacture and sell armature winding machines with such cutting devices is essential to the sale of lines of equipment for the manufacture of electric motors. Manufacturers of such motors prefer to purchase manufacturing equipment which offer complete lines, including armature winding machines equipped with such wire cutting devices. *Id.* at ¶ 8.

Prior to 1985, there were four manufacturers of armature winding machines in the United States: (1) Globe Tool & Engineering Co. ("Globe"); (2) Possis Corporation ("Possis"); (3) Ott-a-Matic, Inc. ("Ott"); and (4) Mechaneer, Inc. ("Mechaneer"). Since 1975, Ott and Mechaneer have manu-

factured and sold armature winding machines pursuant to licenses granted by Possis. Complaint ¶ 10. Globe and Possis manufacture and sell armature winding machines pursuant to a cross licensing agreement. Complaint ¶ 9. Before 1985, Axis and Micafil, A.G., the two principal manufacturer of armature winding machines in Europe, were foreclosed from manufacturing and distributing armature winding machines in the United States because of the patents and license agreements held by the United States companies. Complaint ¶ 14. Odawra, a Japanese company, is also a manufacturer of armature winding machines outside of the United States. *Id.*

In July of 1985, Micafil, A.G., through its wholly-owned subsidiary the defendant Micafil acquired all the assets of the motor equipment division of Possis. Complaint ¶ 15. The assets purchased by Micafil included the various patents and patent licenses covering armature winding machines. *Id.* At the time of the asset acquisition, Possis held a forty percent share of the U.S. market for armature winding machines.

In September of 1985, Micafil, A.G., through its wholly-owned subsidiary Micafil acquired all the assets of Mechaneer. The purchase included the patent licenses for the manufacture of armature winding machines from Globe and Possis. At the time of the acquisition, Mechaneer held a ten percent U.S. market share for armature winding machines. Complaint ¶ 17. Prior to Micafil's acquisition of Mechaneer, Axis became aware that Micafil intended to purchase Mechaneer. Axis contacted Mechaneer "to determine whether it was for sale." Complaint ¶ 16. The president of Axis "was advised that negotiations with Micafil had, in fact, reached the point where an acquisition by Micafil was likely and that Mechaneer, therefore, would not discuss a possible acquisition by Axis." *Id.*

At some point, the Japanese company, Odawra, acquired Ott and entered the U.S. market. Complaint ¶ 19.

The plaintiff instituted this action claiming that "the acquisition of Mechaneer by Micafil raised substantially the barriers to entry into the U.S. market for manufacture and sale of armature winding machines for all potential manufacturers, particularly Axis, and ... has prevented Axis' entry into the market." Complaint ¶ 19. The plaintiff claims that it was ready and willing to acquire Mechaneer had it been allowed to do so. Specifically, the plaintiff alleges that "Axis was ready, willing and able to pay an equal price for the assets of Mechaneer purchased by Micafil as was paid by Micafil." Complaint ¶ 18. The plaintiff claims that had it been allowed to purchase Mechaneer, it would have been able to immediately enter the U.S. market for armature winding machines. Complaint ¶ 20. The plaintiff claims that "[t]he only thing preventing such an entry is the lack of licenses for the Possis patents now owned by Micafil." Complaint ¶ 20.

The plaintiff alleges that as a result of Micafil's acquisition of both Possis and Mechaneer: (1) the U.S. market for armature winding machines has become even more highly concentrated; (2) there are only three U.S. competitors rather than four competitors; (3) the barriers to entry in the U.S. market have been substantially raised by elimination of possible licenses and acquisition vehicles; (4) the "competition in the U.S. market for armature winding machines may be, and in fact has been substantially lessened in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 7 of the Clayton Act (15 U.S.C. § 18);" and (5) that Axis has suffered loss of profits and sales that it would have sold to U.S. manufacturers of fractional power motors. Complaint ¶ 22.

## III. DISCUSSION.

In its motion to dismiss, the defendant claims that the plaintiff's complaint fails to state a claim because the plaintiff has failed to allege an antitrust injury. The defendant argues that the plaintiff's alleged injury is not "one that flows from the supposed anticompetitive effect of the challenged acquisitions." Defendant's Memorandum in Support of Motion, p. 2. The defendant claims that the plaintiff's alleged

injury would have occurred regardless of the identity of the acquirer or whether an acquisition had occurred at all. Specifically, the defendant claims that, notwithstanding the acquisitions, the plaintiff would have been foreclosed from the U.S. market because Axis did not hold any patents or licenses for the manufacture of armature winding machines.

The plaintiff, on the other hand, claims that it has alleged an antitrust injury. The plaintiff argues that the complaint alleges that Micafil's acquisitions of Possis and Mechaneer resulted in substantially raised barriers and thereby decreased competition in the U.S. armature winding machine market. Moreover, as a result of that decreased competition and ability to enter the market, the plaintiff has suffered an injury. Further, the plaintiff argues that the injury is more than causally related to the acquisitions by Micafil and flows directly from the anticompetitive effect of the defendant's antitrust violations.

Section 4 of the Clayton Act provides for the recovery of treble damages for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C.A. § 15. Section 16 of the Clayton Act provides for injunctive relief "against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damages is granted by course of equity...." 15 U.S.C.A. § 26. The plaintiff claims that the antitrust laws violated by the defendant include § 1 of the Sherman Act and § 7 of the Clayton Act. Section 7 of the Clayton Act provides that

> [n]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, *the effect of such acquisition may be substantially to lessen*

*competition, or tend to create monopoly.*

15 U.S.C.A. § 18 (emphasis added). Section 1 of the Sherman Act provides that "[e]very contract, in the combination of the form of trust or otherwise, or conspiracy, the restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C.A. § 1.

■ A prerequisite to a private right of action under § 4 and § 16 of the Clayton Act is an antitrust injury. The resolution of what is an antitrust injury for purposes of § 4 and § 16 of the Clayton Act is a nebulous concept. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976), the Supreme Court held that

> for plaintiffs to recover treble damages on account of § 7 violation, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful. · The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Court extended the same antitrust injury analysis to actions under section 16 of the Clayton Act. Moreover, the fundamental theme of an antitrust injury analysis is that "[t]he antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis in original).

■ In addition to establishing antitrust injury under a § 4 analysis, the plaintiff must also establish standing. "A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper

plaintiff under § 4 for other reasons." *Cargill, Inc.,* —- U.S. at ——, 107 S.Ct. at 489, n. 5. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Court considered the antitrust injury requirement under the *Brunswick* analysis and also considered whether the plaintiff, notwithstanding antitrust injury, had sufficient standing to assert the claim. *See also Southaven Land Co., Inc. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983).

On a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. the district court must review the facts in the light most favorable to the plaintiff and accept those facts as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976); *Davis H. Elliot Co. v. Carribean Utilities Co.,* 513 F.2d 1176, 1182 (6th Cir.1975). The defendant has moved the Court for a motion to dismiss pursuant to Rule 12(b)(6) on the basis that the plaintiff has failed to state an antitrust injury. Consequently, the only issue before this Court is whether the plaintiff has stated an antitrust injury and thus, for the purposes of this motion, the Court assumes that the defendant's acquisition of Mechaneer violates § 7 of the Clayton Act and § 1 of the Sherman Act as alleged in the complaint.

In support of its motion to dismiss, the defendant relies heavily on the proposition that any alleged injury attributed to an alleged violation of § 7 of the Clayton Act and § 1 of the Sherman Act is one that would have occurred notwithstanding the alleged violations. In other words, the plaintiff would be suffering the same injury had the defendant not acquired Mechaneer and Possis, or if Mechaneer and Possis continued to operate in their previous capacities. Moreover, the defendant argues that the barriers to Axis' entry into the U.S. market are the patents and licenses held by Possis and Globe, and that notwithstanding the acquisition of Mechaneer Axis would still be barred from entry into the U.S. market because of its lack of patents or licenses. The defendant argues that the plaintiff readily admits that patents and licenses are a barrier to entry. Complaint ¶ 20. Thus, the defendant claims that the injury sustained by the plaintiff does not flow directly from the alleged violation, or the anticompetitive effect.

The defendants rely heavily on the Third Circuit Court of Appeals decision in *Alberta Gas Chemicals v. E.I. DuPont Co. De Nemours,* 826 F.2d 1235 (3rd Cir.1987). *Alberta Gas* is a Canadian manufacturer of methanol. Conoco was an American company with large resources of coal which planned to invest large sums of money to build a manufacturing plant in the U.S. that would transform its large coal reserves into methanol. As part of that plan, Conoco envisioned developing a large network of retail outlets to reach the ultimate consumer. *Alberta Gas,* 826 F.2d at 1235. Aware of Conoco's plan, Alberta Gas figured that Conoco would need to buy methanol from other suppliers such as Alberta Gas to supply its network of consumer outlets pending the completion of Conoco's proposed plant. Moreover, Alberta Gas was of the opinion that Conoco's efforts would eventually increase the overall demand for methanol and thus Alberta would benefit in the long run. *Id.* Prior to Conoco's imposition of the plan, DuPont acquired Conoco. DuPont was a manufacturer of methanol with a twenty-five to thirty percent share of the market in the U.S. at the time of the acquisition. After acquiring Conoco, DuPont cancelled the plan to invest in the coal/methanol producing plant. Thereafter, Alberta brought an action against DuPont claiming that Conoco's plan was terminated to protect DuPont's own monopoly in the U.S. market. The district court granted summary judgment in favor of the defendant and held that there was no antitrust injury resulting from DuPont's acquisition of Conoco. The district court and the circuit court for purposes of the motion assumed that the acquisition had violated the antitrust laws, and in that case § 7 of the Clayton Act.

The Third Circuit's opinion in *Alberta Gas* is an excellent review of the antitrust injury analysis and the standing analysis applied in antitrust actions. The *Alberta Gas* decision relies heavily on the proposition that alleged injury must relate specifically to the anticompetitive effect of the alleged antitrust violation. The Third Circuit stated that the "Clayton Act deterrence through compensatory provisions is aimed toward the directly harmful effects of an antitrust transgression. The statutory sanctions do not constitute a broad restitutionary scheme for injuries not closely related to the violation, but caused by other effects, desirable or not, of the illegal conduct." *Alberta Gas*, 826 F.2d at 1240 (citations omitted). The Third Circuit went on to hold that Alberta Gas' losses were not the result of the merger. "Alberta's alleged losses were neither connected with, nor resulted from, DuPont's market power in the methanol-producing industry. That is clear because the *same harm would have occurred had any acquirer decided to curtail Conoco's production and marketing plans.*" *Alberta Gas*, 826 F.2d at 1241 (emphasis supplied). The Third Circuit also relied on *Brunswick* for the finding of no antitrust injury and states that "because Alberta's injuries would have occurred absent a violation of § 7, they do not flow from the anticompetitive effects of the merger." *Alberta Gas*, 826 F.2d at 1242.

The defendants argue that *Alberta Gas* clearly establishes that there is no antitrust injury alleged because the plaintiff's injury would have occurred absent any alleged violation of § 7 of the Clayton Act or § 1 of the Sherman Act. The defendants argue that notwithstanding the acquisition of Mechaneer, the plaintiffs would still be barred from the U.S. market because Axis has no patents or licenses to produce armature winding machines in the United States. In sum, they argue that the alleged injury of the plaintiffs does not flow directly from the acquisition of Mechaneer, but rather its inability to develop new technology or obtain patents and licenses.

The defendant also relies on the *Brunswick* decision and the facts giving rise to

that case. In *Brunswick*, a large manufacturer of bowling equipment acquired a number of failing bowling alleys in the plaintiff's market area. *Brunswick*, 429 U.S. at 479–80, 97 S.Ct. at 692–93. The plaintiff brought an action under § 4 of the Clayton Act claiming that they were injured as a result of the defendant's acquisition of the failing bowling alleys. The plaintiff's claim that had the defendant not acquired the bowling alleys, the bowling alleys would have closed and the plaintiff would have realized increased sales and profits. The Court did not find antitrust injury because the defendant's actions resulted in increased competition. The *Brunswick* court relied on the *Brown Shoe* court and protected competition and not the competitors. *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697. The defendant attempts to analogize the facts of this case to those of *Brunswick* and argues that the plaintiff cannot state an antitrust injury as a result of increased competition in the U.S. market.

The plaintiff's primary argument in opposition to defendant's motion to dismiss is that antitrust injury is a result of the defendant's anticompetitive conduct. The plaintiff argues that the defendant's acquisition of both Mechaneer and Possis decreased the number of U.S. competitors from four to three. Moreover, the acquisitions gave Micafil at least a fifty percent share of the U.S. market for armature winding machines. The consolidation of two of the four competitors, according to the plaintiff, substantially reduced the ability of companies such as Axis to obtain a license to produce the armature winding machines. The plaintiff further argues that it would not be in the same position but for the acquisition of Mechaneer and Possis by Micafil. The plaintiff argues and alleges that had Micafil not purchased Mechaneer, the plaintiff would have been able to purchase Mechaneer and thus enter the U.S. market for armature winding machines. Accordingly, the plaintiff argues that their injury flows directly from the alleged anticompetitive conduct of the defendant.

The plaintiff also opposes the defendant's analogy of this case to the facts in *Brunswick.* The plaintiff argues that in *Brunswick* the focus was on increased competition whereas in this case the focus is on decreased competition. The plaintiff argues that as a result of the defendant's actions the U.S. market for armature winding machines has experienced a decrease in competition.

■ Construing the facts alleged in the complaint in a light most favorable to the plaintiff, the Court finds that the plaintiff has failed to allege an antitrust injury under § 4 and § 16 of the Clayton Act. Assuming an alleged violation of § 7 of the Clayton Act and § 1 of the Sherman Act, and even assuming that the plaintiff would have acquired Mechaneer thereby gaining entry into the U.S. market had the defendant not acquired Mechaneer, the Court finds that the plaintiff has failed to establish an antitrust injury. The plaintiff has failed to allege facts that establish that the alleged injury flows directly from the alleged anticompetitive acts of the defendant. The Court finds that the plaintiff's alleged injury would have occurred notwithstanding the defendant's alleged antitrust violations. Further, the Court finds that the plaintiff's alleged injury does not flow directly from the alleged anticompetitive act of the defendant.

The complaint itself establishes that the plaintiff's alleged injury could flow from at least two other sources. First, the plaintiff admits that the patents and licenses prevent its entry into the U.S. market. Complaint ¶ 20. The plaintiff summarily addresses the patent and license barriers in its reply memorandum in opposition to the defendant's motion to dismiss stating that

[t]wo years ago there were four U.S. companies manufacturing and selling armature winding machines. To enter most U.S. markets, potential entrant need only set up sales and manufacturing force in the U.S. The market for armature winding machines, however, had additional barriers to entry which were quite high: the patents and the cross-license agreement. Absent a li-

cense from Globe and Possis, the only way to enter would be to develop an entirely new, non-infringing technology.

In 1985–86, the patent barrier was, in effect, lowered when three of the U.S. companies decided that they would consider selling their respective businesses; *rather than needing a new technology, the entry barrier was the purchase price of one of these companies.* Plaintiff's Reply Memorandum in Opposition to Defendant's Motion to Dismiss, p. 1 (emphasis added). The plaintiff has merely attempted to transform the patent barrier into an acquisition barrier. Second, the entry of Odawra, the Japanese firm, raises the inference that plaintiff's alleged injury may also be attributable to Odawra.

### IV. CONCLUSION.

The Court finds that the plaintiff's alleged injury would have occurred absent the alleged anticompetitive act of the defendant. Accordingly, the Court finds that the defendant's motion to dismiss for the failure of the complaint to allege an antitrust injury is well taken. This case is hereby dismissed.

IT IS SO ORDERED.